IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) ) ) | |
| Plaintiff, | ) ) | 13 C 2782 |
| v. | ) ) ) | Judge Ronald A. Guzmán |
| ILLINOIS STATE BOARD OF EDUCATION and CARMEN and DAVID ELLETT, parents and next friend of W.E., a minor, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, the Board of Education of the City of Chicago, asks the Court to reverse portions of the decision made by defendant Illinois State Board of Education in favor of defendants Carmen and David Ellet, parents of W.E., pursuant to the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i). For the reasons set forth below, the Court affirms in part and reverses in part the decision.

**Facts**

W.E. entered Whitney Young, a Chicago Public Schools Magnet High School, in the fall of 2009. (*See* Pl.'s Resp. Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 1.) Though he had previously been an "A" student, W.E.'s grades plummeted during his first two years of high school. (*Id.*) In April 2009, W.E. started seeing a private psychologist, Dr. Marilyn Johnson, "to help figure out what's going wrong in school." (*Id.* ¶ 2.)

On October 26, 2010, Carmen Ellet told Whitney Young's Director of Counseling, Norma Chinn, that Dr. Johnson had advised the Elletts to look into testing for W.E. (*Id.* ¶ 3.) Chinn told Carmen to contact W.E's counselor, Ms. Hogan, and Whitney Young Case Manager, Elizabeth McKenzie-Carter, which the Ellets did. (*Id.* ¶¶ 4-5.)

On November 19, 2010, McKenzie-Carter told the Ellets that an Intervention Assistance Team ("IAT") meeting would be held regarding W.E. on December 1, 2010. (*Id.* ¶ 6.)

On November 20, 2010, Dr. Johnson wrote to Whitney Young staff, saying it was her "professional opinion that [W.E.] needs a battery of tests to understand fully why he is incapable at this point to achieve his goals." (*Id.* ¶ 9.)

On December 1, 2010, the IAT meeting was held, and the team recommended that W.E. continue therapy with Dr. Johnson, see a school counselor intern as necessary and begin informal testing with the school psychologist. (*Id.* ¶ 10.) The team did not, however, recommend that W.E. receive formal testing, and the school psychologist never completed the informal testing. (*Id.* ¶¶ 6, 10-11.)

On December 29, and 31, 2010, at the recommendation of Dr. Johnson, the Ellets had W.E. tested by Dr. Gregor, a neuropsychologist. (*Id.* ¶ 12.) On January 28, 2011, Dr. Gregor issued her report, concluding that:

> [W.E.] has a weakness of his processing speed and speed of information processing abilities. Since learning often involves a combination of routine information processing (such as reading) and complex information processing (such as reasoning), a weakness in the speed of processing routine information may make the task of comprehending novel information more time-consuming and difficult for him. [W.E.'s] significantly depressed processing speed is likely a result of a combination of factors including: depression, ongoing marijuana abuse, and ADHD, all overlaying a somewhat perfectionistic personality style. . . .

2

> Taken together, [W.E.'s] behavioral observations, clinical diagnostic interview, collateral interviews, and current test findings support the diagnosis of Dysthymic Disorder [, *i.e.*, chronic depression], Cannabis Abuse, and Attention Deficit-Hyperactivity Disorder – combined type – mild.
>
> Emotional psychological actors seem to be significantly contributing to [W.E.'s] presentation. [W.E.] and his family report ongoing (over the past year) and significant symptoms of depression including: irritable mood, oppositional behavior, difficulty with sleep, poor concentration, and low self-esteem. . . . Depression can impact an individual's mood, cognitive abilities, and behavior. . . . At this time, [W.E.] has a pessimistic view of the future. When asked about his future goals, he could not identify any. When asked about any three wishes that he could have, [W.E.] names his first wish to "be really happy." . . . [W.E.] currently reports a "much lower than average" self-concept . . . and reports significant and clinical symptoms of depression. . . . .

(*See* Jan. 28, 2011 Gregor Report at 12, Administrative Record ["AR"] 1215-16) The Ellets gave Dr. Gregor's report to plaintiff. (Pl.'s Resp. Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 12.)

On January 26, 2011, defendants scheduled a second IAT meeting for February 9, 2011. (Defs.' LR 56.1(b)(3)(B) ¶ 16.) The record does not show whether that meeting occurred or any action was taken as a result.

On March 3, 2011, W.E. was suspended from school for five days for a "tagging" incident. (Pl.'s Resp. Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 14.)

On May 6, 2011, Dr. Johnson asked Whitney Young to provide an "in milieu" program for W.E., who was eager to resolve his problems and willing to undergo any testing, therapy or other interventions plaintiff suggested. (*Id.* ¶ 16.)

On May 12, 2011, plaintiff scheduled a meeting with the Ellets for May 26, 2011 to discuss Dr. Gregor's reports and determine if W.E. qualified for any services or accommodations. (*Id.* ¶ 18.)

On May 13, 2011, W.E. was caught with marijuana and a smoking pipe at school and suspended for ten days. (*Id.* ¶ 19.)

On May 26, 2011, the Ellets told Whitney Young they were taking W.E. out of the school. (*Id.* ¶ 20.) Thereafter, they sent him to Elements, a month-long wilderness program for troubled adolescents that did not have an academic program. (*Id.* ¶ 21.)

On June 27, 2011, the Ellets requested an IDEA due process hearing. (*Id.* ¶ 27.)

On July 29, 2011, the Ellets enrolled W.E. in Monarch, a residential alternative education program in Montana. (*Id.* ¶ 29.) Ultimately, W.E. was asked to leave Monarch because of his "oppositional behavior." (*Id.* ¶ 36.)

On January 12, and 13, 2012, plaintiff conducted a formal evaluation of W.E. (*Id.* ¶ 42.)

On January 21, 2012, the Ellets enrolled W.E. in Crossroads, a therapeutic boarding school in Utah. (*Id.* ¶ 43.)

On February 27, 2012, plaintiff held an initial eligibility meeting for W.E., determined that he was a student with a disability entitled to services under the IDEA and developed an Individual Education Program ("IEP") for him. (*Id.* ¶¶ 51-52.) The IEP called for W.E. to remain in general education classes but be given fifty percent more time for task completion, to consult with a special education teacher for ten minutes each day and to see the school social worker for thirty minutes each week. (*See* IEP, AR 1131-49.)

On December 17, 2012, after a due process hearing, the Hearing Officer issued a decision finding that plaintiff had failed to provide W.E. free appropriate public education ("FAPE") as required by the IDEA and ordering it to reimburse the Ellets for, among other things: (1) "the academic portion of the Monarch School Program"; (2) "the total costs of the Crossroads program"; and (3) the fees the Ellets paid to experts for testifying at the due process hearing. (Hr'g Officer's

Decision at 36, AR 379-80.) Plaintiff contends that these portions of the decision should be reversed.

## Discussion

When, as here, review of a hearing officer's decision is based only on the record of the administrative proceedings, the Court "is required to give 'due deference' to that decision." *Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 815 (7th Cir. 2001) (quotation omitted). In other words, the Court can set aside the decision only if it is "strongly convinced that the [decision] is erroneous." *Id.*

Plaintiff does not contest the Hearing Officer's conclusion that it did not provide W.E. free, appropriate public education ("FAPE") as required by the IDEA. (*See* Pl.'s Reply Mem. Supp. Mot. Summ. J. at 1.) However, plaintiff contends that the Hearing Officer had no authority to order it to reimburse W.E.'s parents for their expert witness fees because expert testimony is not a component of FAPE.

The IDEA defines FAPE as special education and "related services," which are "transportation, and such developmental, corrective, and other supportive services (including . . . psychological services, . . . counseling services, including rehabilitation counseling, . . .and medical services . . . for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(9), (26)(A). "Psychological services" include: (1) "[a]dministering psychological and educational tests, and other assessment procedures;" (2) "[i]nterpreting assessment results;" (3) "[o]btaining, integrating, and interpreting information about child behavior and conditions relating to learning;" (4) "[c]onsulting with other

staff members in planning school programs to meet the special educational needs of children as indicated by psychological tests, interviews, direct observation, and behavioral evaluations;" (5) "[p]lanning and managing a program of psychological services, including psychological counseling for children and parents;" and (6) "[a]ssisting in developing positive behavioral intervention strategies." 34 C.F.R. § 300.34(c)(10). "Medical services" are "services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services." 34 C.F.R. § 300.34(c)(5). Thus, the provision of expert testimony at a due process hearing is not a related psychological or medical service under the IDEA. *Id.*; *see M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 201, 231 (D. Conn. 2008) (holding that school was not required to pay for psychiatrist's fees for managing student's medication regime because medication management was not "not a 'related service' under the IDEA"); *see also Dale M.*, 237 F.3d at 817 (stating that "related services" are those "primarily oriented toward enabling a disabled child to obtain an education"); *Butler v. Evans*, 225 F.3d 887, 895 (7th Cir. 2000) ("The IDEA does not require the government to pay for all the additional services made necessary by a child's disability, and it specifically excludes medical services except those for diagnostic and evaluation purposes.") (quotation omitted). Accordingly, the Court grants plaintiff's motion with respect to expert fees.

Plaintiff also argues that the Hearing Officer improperly ordered it to reimburse the Ellets for the costs of W.E.'s placement at Monarch and Crossroads because they did not give plaintiff notice of their intent to place him in these facilities or make him available to plaintiff for an evaluation. *See* 20 U.S.C. § 1412(a)(10)(C)(ii)-(iv) (stating that reimbursement for private school may be denied if the parents did not give prior notice of their intent to enroll the child in private

school unless: (1) the parents did not know about the notice requirement because they did not receive a copy of the procedural safeguards, which explains the requirement or (2) the parents failed to make the child available to the public school for an evaluation). However, plaintiff's arguments are refuted by its admissions to the Ellets' LR 56.1 Statement of Additional Facts. (*See* Pl.'s Resp. Defs.' LR 56.1(b)(C)(3) Stmt. ¶ 17 (admitting that on May 26, 2011, the Ellets told plaintiff they were removing W.E. from Whitney Young); *id.* ¶ 7 (admitting that plaintiff "did not provide [the Ellets] with a copy of the Notice of Procedural Safeguards . . . at any time prior to October 3, 2011"); *id.* ¶ 18 (admitting that from October 26, 2010, the day the Ellets first asked Whitney Young to evaluate W.E., to May 26, 2011, the day they removed him from Whitney Young, W.E. was available for an evaluation but plaintiff did not perform one).)

Alternatively, plaintiff argues that it should not have to reimburse the Ellets for any costs associated with Monarch or Crossroads because neither was a proper placement; that is, neither school "complied with any part of IDEA's FAPE requirement" and both primarily provided drug treatment services. (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 10-13; Pl.'s Reply Mem. Supp. Mot. Summ. J. at 4-6.) The law is clear, however, that the FAPE requirements set forth in 20 U.S.C. § 1401(9) do not apply to private schools. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 14 (1993) ("As we have noted, . . . [the statutory FAPE] requirements . . . do not apply to private parental placements"); *T.B. ex rel. W.B. v. St. Joseph Sch. Dist.*, 677 F.3d 844, 847 (8th Cir. 2012) (stating that "an alternative placement need not provide certified special education teachers, offer an IEP for the disabled child, or satisfy the least-restrictive environment requirement" set forth in the statutory definition of FAPE to be proper under the IDEA) (citations omitted); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006) (noting that a private school need

7

not "meet the IDEA definition of a free appropriate public education," or "state education standards or requirements" or "provide certified special education teachers or an IEP" to be reimbursable). Moreover, the fact that a private school also provides counseling or other services does not render it improper as long as the services are "primarily oriented toward enabling [the] disabled child to obtain an education." *Dale M.*, 237 F.3d at 817. In short, a placement is proper if it provides "'educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'" *Frank G.*, 459 F.3d at 365 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188-89 (1982)); *see C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist*, 635 F.3d 1155, 1159-60 (9th Cir. 2011) (same).

The Hearing Officer found that Monarch and Crossroads met this standard and that the drug treatment services they provided W.E. were incidental to, and enabled him to benefit from, their academic programs. (*See* Hr'g Officer's Decision at 22-23, 25-26, AR 366-67, 369-70.) These findings are amply supported by the record, which shows that Monarch: (1) is a year-round, college preparatory school licensed by the State of Montana as an alternative residential program; (2) has "therapeutic programming" as one element of an overall program designed to obtain "college matriculation" for all students; (3) has both academic and vocational classes; (4) designs academic programs for its students based on their most recent psychological tests; (5) has an average class size of seven; (6) has teachers on campus five nights a week to assist the students; and (7) was a good academic fit for W.E., who received As, Bs and Cs in his classes there. (*See* Hr'g Officer's Decision at 13, 23, AR 357-58, 366-67; W.E.'s Monarch Transcript, AR 1171; W.E.'s Monarch Report Card, AR 1256-61; Monarch Website Pages, AR 1262-74; Due Process Hr'g Transcript, AR 2542-44,

8

2548-68.) The record shows that Crossroads: (1) has state certified and licensed teachers and one-on-one tutoring; (2) provided "substance abuse treatment" to W.E. because he could not succeed academically until his social and emotional issues were "in check"; (3) offers ACT/SAT preparation classes, college courses and vocational classes; (4) has a classroom structure in which the teacher is always accessible that enabled W.E. to complete his work; and (5) was a good academic fit for W.E., who received As and Bs in his classes and ultimately graduated from the school. (*See* Hr'g Officer's Decision at 14-15, 23, AR 358-59, 367; Crossroads Letters, AR 1275-77; Crossroads Website Pages, AR 1280-81, W.E.'s Crossroads Transcript, AR 1314; Due Process Hr'g Transcript, AR 2211-12, 2599-2600, 2656-2673, 2678-80; *see also* Oct. 2010 Emails from C. Ellet to Pl., AR 967-71, Nov. 2010 Note from Dr. Johnson to Pl., AR 1024 & Jan. 28, 2011 neuropsychologist report, AR 1204-15 (showing that, in the fall of 2010, W.E.'s mother and psychologist repeatedly told school officials that W.E. was having "focus issues" and asked that he be tested, and that in January 2011, W.E.'s neuropsychologist gave him a primary diagnosis of depression).) Accordingly, the Court rejects plaintiff's claim that the Hearing Officer's reimbursement order with respect to Monarch and Crossroads is erroneous, and orders plaintiff to pay the Ellets a total of $152,270.67 ($22,603.15 [for Monarch] + $117,785.00 [for Crossroads] + $11,882.52 [for transportation]). (*See* Hearing Officer's Decision at 36, AR 380; Pl.'s Resp. Defs.' LR56.1(b)(3)(C) Stmt. ¶ 40.)[1]

---

[1] The parties agreed that the total costs including expert fees was $154,729.67. (*See* Pl.'s Resp. Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 40.) In fact, those costs total $154,720.67, *i.e.*, $9.00 less than the amount to which the parties agreed. The Court eliminated both the $9.00 error and the expert witness fees from its calculation.

The Ellets contend that they should be awarded prejudgment interest on that amount, a request plaintiff opposes. In this circuit, prejudgment interest is "presumptively available to victims of federal law violations." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (noting that "federal common law authorizes the award of [prejudgment] interest in appropriate cases to victims of violations of federal law" and stating that "[t]he time has come . . . to announce a rule that prejudgment interest should be presumptively available" because without it "compensation of the plaintiff is incomplete and the defendant has an incentive to delay"). Whether an award of interest is appropriate in an IDEA case depends on the equities of the case. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374 (1985) ("[T]he court was correct in concluding that . . . equitable considerations are relevant in fashioning relief [for IDEA violations]."). The Court may consider, among other factors, whether there were "other, perhaps more appropriate, substitute placements, the effort expended by the parents in securing alternative placements, and the general cooperative or uncooperative position of the school board." *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 325 (4th Cir. 2009) (quotation and alterations omitted).

In this case the equities favor an award of interest. The record shows that the Ellets repeatedly asked plaintiff to evaluate W.E. and provide services to address his needs, plaintiff responded belatedly and indifferently, conducting limited informal testing of W.E. and offering inadequate services months after they were first requested, and the Ellets considered other placements for W.E., all of which were far more expensive than the programs they chose. (*See supra* at 2-4; Due Process Hr'g Transcript, AR 2579-2611 (testimony of educational consultant Imy Wax, hired by the Ellets to find a placement for W.E., about the cost and appropriateness of various

programs)).)  Accordingly, the Court exercises its discretion to award the Ellets prejudgment interest.

## Conclusion

For the reasons set forth above, the Court reverses only that portion of the Hearing Officer's decision ordering plaintiff to reimburse the Ellets for their expert witness fees and orders plaintiff to reimburse the Ellets $152,270.67 plus interest at the prime rate from the date the Hearing Officer's decision was issued until the date judgment is entered in this case.  The parties have until October 7, 2013 to submit an agreed proposed judgment order setting forth the total amount of the judgment to be entered.

**SO ORDERED.**          **ENTERED: October 1, 2013**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**